THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| RODNEY J. COOK, | ) | 4:07CV3241 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| UNION PACIFIC RAILROAD | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

In this employment discrimination action, plaintiff Rodney Cook asserts two claims against the Union Pacific Railroad Company ("UP")—first, UP intentionally discriminated against Cook on a record of disability or a perceived disability in violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12101, *et seq.*[1] ("ADA") when it refused to reinstate Cook to his locomotive engineer position; and second, UP violated Nebraska law when it retaliated against Cook by refusing to reinstate him due to his assertion of Federal Employer's Liability Act ("FELA") claims. (Filing 1, Complaint; Filing 33, Order on Final Pretrial Conference.)

Both parties have filed motions for summary judgment. (Filings 18 & 21.) For the reasons that follow, I shall grant summary judgment in favor of defendant UP.

## I. UNDISPUTED MATERIAL FACTS

1. Plaintiff Rodney Cook actively worked for defendant Union Pacific Railroad from August 14, 1978, until 1996. During the time relevant to this lawsuit,

---

[1]The ADA Amendments Act of 2008 amends several sections of the ADA, but these changes do not become effective until January 1, 2009.

Cook worked as a locomotive engineer for UP. (Filing 19-3, NEOC Hearing Tr. 25:2-26:17.)

2.      Cook allegedly suffered an on-the-job back injury in 1986.  (Filing 23-3, NEOC Hearing Tr. 31:22-32:3, at CM/ECF pp. 3-4.)   Cook filed a Federal Employer's Liability Act ("FELA") complaint against UP related to the injury and received approximately $200,000 from UP to settle this claim. (Filing 23-3, Cook Dep. 35:1-36:25, at CM/ECF pp. 51-52.)

3.      Cook continued to work as a locomotive engineer for UP until suffering another alleged on-the-job back injury in 1996. (Filing 23-3, NEOC Hearing Tr. 37:5-12, at CM/ECF p. 5; Filing 23-3, NEOC Hearing Tr. 99:18-24, at CM/ECF p. 11.)

### The 1996 Injury:  FELA Proceedings

4.      Cook filed another FELA complaint against UP in the District Court for Denver County, Colorado, entitled *Rodney J. Cook v. Union Pacific Railroad Company*, Case No. 97-CV-2831, for damages he suffered as a result of the alleged back injury.  (Filing 23-3, Request for Admission No. 6, at CM/ECF p. 44.)

5.      In his complaint, Cook alleged the following:

Plaintiff's injuries hereinbefore enumerated have been permanent, painful, disabling and incapacitating, and for an indefinite time in the future will be painful, disabling, and incapacitating, and have caused and will cause the Plaintiff loss of full enjoyment of life. . . .

By reason of the facts hereinbefore stated and the injuries caused Plaintiff thereby, Plaintiff was deprived of his earning power, to his damage in an amount as yet unascertainable . . .

(Filing 23-3, Request for Admission No. 8, at CM/ECF p. 44.)

6.    Cook's attorney made the following argument to the jury in the FELA case:

> Mr. Cook can't come back into court in 5 years or 10 years or any time and ask Judge Behrman or any other judge for reassessment or somebody else to look at this case and reassess his damages. *What he's awarded, if anything, by you has got to cover this past 3 years, 9 months, and the future, 36, 37 years.*

(Filing [23-3](), Request for Admission No. 9, at CM/ECF p. 45 (emphasis added).)

7.    Cook's attorney also told the jury:

> If we look at the future wage loss, if he returns to work as an engineer, after he goes through the medical treatments in the future here; he gets the shots, physical therapy, and/or surgery, I would assume it's going to take him about two years to get all that done and get back to work. That loss would be $71,400 a year, which was his average for '94 and '95, 142,000. Loss of fringe benefits, about 175,000.

> If he's *unable to go back to work as an engineer* after all this medical treatment, he goes through the medical treatment, he loses the same there, 142. I've assumed, if he gets a job as a stockbroker making 30,000 a year, he's going to be losing about 41,000 a year for two years. Then I've assumed after two years he's going to make 50,000 a year. And if he loses 71,000, again, less 50, that's about 21,000 for two years.  And thereafter, I assumed he wouldn't lose anything; he's been worked up to what he could—was making on the railroad.

> . . .

> *[s]o in that range of 473 to the 694, depending on whether you think he's going to be able to go back to work as an engineer after he gets his treatment or he has to get some other job.*

3

(Filing 23-3, Request for Admission No. 10, at CM/ECF pp. 45-46 (emphasis added).)

8.    Cook provided the following testimony during the FELA trial:

First off, I would probably do the injections with Dr. Turner, since it—or Dr. Kleen, since it's the least invasive. Try that, and if—he recommended I do different injections, three different times. And if that helps, I could go back to work. If that did not help, I would like to go back to Dr. Turner and remove the hardware, trim the disk, do a nerve decompression on the left leg sciatic nerve. And if I felt good where I don't have this pain coming and going, I would love to go back to work.

(Filing 23-3, Request for Admission No. 11, at CM/ECF p. 46.)

9.    Cook also testified:

And the main reason the—that—and *what really concerns me is—the safety*, as far as my fellow employees, people on other trains, as far as opposing trains, and the public, because pain pretty much controls my life. *If I'm out there and thinking about pain and not thinking about my job*—and there's literally hundreds of things that you have to do, that you have to be aware of; and if I'm out there, and all I'm thinking about is pain, and I'm spacing off, *and I run over somebody at a crossing, hit a school busload of kids, or if I run the red signal and I run into another train, cost millions of dollars of damage and—kill myself and other people, I just don't really want that on my head.*

(Filing 23-3, Request for Admission No. 12, at CM/ECF p. 46 (emphasis added).)

10.    Cook's physician provided the following testimony at the FELA trial:

I don't think he's ever told [me] he was ever incapacitated from doing things. He just said he has chronic back pain and the train ride issue. He

4

told me he just couldn't ride trains because of his back.  But I don't think, for example, he ever told me he can't work in his yard or anything like that. . . .

*The only thing [Cook] told me [is that] he's incapable of doing is, you know, riding trains for hours at a time day after day.*

(Filing 23-3, Request for Admission No. 13, at CM/ECF p. 47 (emphasis added).)

11.     Cook received a jury verdict in his favor in the FELA case in the amount of $610,000.  (Filing 23-3, Request for Admission No. 7, at CM/ECF p. 44.)

12.     Cook admitted in his subsequent NEOC hearing that nothing said by his attorney in the FELA trial was inaccurate or misleading and that he never asked his attorney to withdraw the closing argument.  (Filing 23-3, NEOC Hearing Tr. 99:18-100:25, at CM/ECF pp. 11-12.)

13.     Cook further admitted that he was present at the FELA trial and was so actively involved that he gave his attorney some questions to ask.  (Filing 23-3, NEOC Hearing Tr. 100:7-11, at CM/ECF p. 12.)

### *Cook Seeks Reinstatement*

14.     After being off his job as a locomotive engineer for four years and nine months, Cook requested that UP reinstate him as a locomotive engineer on June 27, 2001.  (Filing 19-3, NEOC Hearing Tr. 53:13-54:1, at CM/ECF p. 5; Filing 23-4, at CM/ECF pp. 1-15 (Requests for Leaves of Absence).)   UP admits that Cook attempted to return to work as a train engineer in June 2001, and on numerous occasions thereafter, and that UP denied those requests.  (Filing 9 ¶ 13.)

15.     UP denied Cook's request to "return to work *as an Engineer*" on January 3, 2002, in a letter from F.A. Tamisiea, Director of Labor Relations for UP, which explained that Cook was estopped from claiming he was available to return to work as an engineer because of the position he took in the FELA case. The letter states: "Mr. Cook is estopped from claiming he is available to work *in his prior capacity*. . . . Mr. Cook did not resign but he would remain on the applicable seniority rosters in a disabled status, which is for the purpose of disability benefits. Therefore, since Mr. R.J. Cook is permanently disabled to perform service in the operating craft transportation department, [UP] must respectfully deny [the] request [to return to work as an engineer] in its entirety." (Filing 23-3, NEOC Hearing Tr. 89:9-90:25, at CM/ECF pp. 9-10; Filing 25-3 (emphasis added).)

16.     UP issued a second letter from F.A. Tamisiea dated June 4, 2002, reiterating its position regarding the issue of whether "to return Mr. Cook to active service." Specifically, the letter states: "Mr. Cook is estopped from returning to work as a result of his personal injury and 'Satisfaction Of Judgement' which was in favor of Engineer Cook and against Union Pacific Railroad Company ordered by the District Court, City and County Of Denver, Colorado on October 4, 1999." In support of UP's decision, the letter stated as follows:

> [Cook] testified in Court . . . that [he] has permanent restrictions preventing him from being able to perform the day-to-day duties *of an Engineer* and to continue to perform them safely. Engineer Cook claimed the pain from his injury controls his life and if he could work *as an Engineer*, the pain was so extreme that he probably could not operate a train and *perform engineer duties* in a safe manner. Thus, Mr. Cook claims his pain along with his permanent restrictions could result in possible catastrophic injuries to fellow employees, the general public and millions of dollars in damage to property. . . .
>
>      . . . .

6

> . . . Nothing has changed with respect to [Cook's] permanent and disabling injuries which would allow him to work safely and *in the capacity of the operating crafts*.
>
> . . . .
>
> . . . Claimant Cook having declared his permanent disability and permanent restrictions, in addition to receiving injury settlements, is estopped from now claiming that he is able to work *in his prior capacity*.

(Filing 23-3, NEOC Hearing Tr. 78:12-80:13, at CM/ECF pp. 6-8; Filing 25-4 (emphasis added).)

17.    Cook received a letter dated December 6, 2004, from C.A. Scott, General Superintendent of the North Platte Service Unit of UP, stating, "In response to your request for re-employment with Union Pacific Railroad, I have reviewed your file. The decision for termination was upheld by the Labor Board, therefore, your request for re-employment is denied."[2]

18.    On December 16, 2004, Cook supplied a doctor's note to UP which cleared him for full duty as an engineer with the railroad. (Filing 19-3, NEOC Hearing Tr. 53:10-55:7 & Attached Ex.)  UP told Cook he was required to submit to

---

[2]Contrary to the assertion in this letter that Cook's "termination was upheld by the Labor Board," the Public Law Board's opinion states nothing of the kind. Specifically, the Board decided there was "no claim ripe for action" as to Cook's claim "for reinstatement to service to be allowed to exercise his engineer seniority." The Board's opinion explained that UP and Scott had "mutually stipulated . . . that [Scott] did not resign and was not removed by [Union Pacific] from the seniority roster." Further, the Board's "jurisdiction and authority" did "not extend to making medical judgements concerning [Scott's] physical fitness for return to work." (Filing 19-4; Filing 19-6, at CM/ECF pp. 1-6.)

a return-to-work physical, which Cook agrees is standard procedure. Cook called the Union Pacific Medical Director's Office a few days later and was told that the Union Pacific Claims Department put Cook's file "on hold." (Filing 19-3, NEOC Hearing Tr. 59:21-62:2; Filing 20, at CM/ECF pp. 4-5; Filing 24, at CM/ECF pp. 2-3 (admitting various facts stated by Plaintiff).)

19.     Cook submitted "leave of absence" forms to UP beginning on June 11, 2001, and continuing until February 15, 2005, indicating that Cook had received a return-to-work release from his physician. (Filing 23-4, at CM/ECF pp. 1-15.)

### *NEOC Administrative Proceeding*

20.      On January 26, 2005, Cook filed a charge of discrimination with the NEOC and EEOC. (Filing 23-4, at CM/ECF p. 16.)

21.     In his charge, Cook stated: "I do not have a disability"; "I believe I have been discriminated against on the basis of Record of Disability"; and that his "Leave of Absence reports" noting that he was "[a]ble to return to work full duty with no restrictions" were considered by Cook "to be requests to be returned to [his] *Engineer position*." *Id.* (emphasis added).

22.     The NEOC found reasonable cause on Cook's "record of disability" claim. (Filing 23-3, at CM/ECF p. 55.)

23.     On October 5, 2006, Cook's case was tried before NEOC Administrative Law Judge ("ALJ") Charles Scudder. (Filing 23-3, NEOC Hearing Tr. 1-2, at CM/ECF pp. 1-2.)

24.     Cook was represented by counsel and was allowed to call witnesses and introduce other evidence at trial under oath, and the hearing officer ruled on evidentiary objections.  (Filing 23-3, NEOC Hearing Tr.)

25.     Cook testified at the NEOC hearing that he visited the Nebraska Job Service from the time of his FELA trial through 2001, and its staff concluded that based on Cook's education, which included a bachelor's degree in business administration and economics, Cook could perform jobs "within [his] restrictions," including a "conductor or trainman," a "management position," or "pretty much . . . any job . . . within [his] restrictions."  (NEOC Hearing Tr. 121:4-122:15.)

26.     Cook also testified at the hearing that at the time he had his alleged "record of disability," he engaged in the following activities: (1) did all of his own household chores, such as laundry and cleaning; (2) prepared his own meals; (3) mowed his lawn; (4) shoveled snow; (5) worked on his car; (6) hunted; (7) never used a walker, wheelchair, or other assistive device other than for two weeks immediately after a back surgery; (8) took care of the maintenance on his rental home; (9) did concrete work, including swinging a sledge hammer, driving stakes, and pouring concrete; (10) did landscaping work; (11) did sheetrock work on his home; and (12) did extensive traveling to the Far East, Russia, Yellowstone, and Mount Rushmore. (NEOC Hearing Tr. 112:15-117:7.)

27.     Cook further testified that his treating physician was aware that Cook was engaging in these activities and had opined that these activities were well within Cook's restrictions.  (NEOC Hearing Tr. 117:8-14.)

28.     The undisputed evidence presented at the NEOC hearing from both Robert A. Henderson, Assistant Director of Labor Relations for UP, and Ford Demming, Senior Claims Specialist for UP, was that the designation "permanently disabled" on the seniority roster is merely an administrative designation that means

9

Cook is permanently unable to "return to . . . his previous job that he was in."  In Cook's case, the designation means he cannot "return to his job *as a locomotive engineer*."  Henderson testified, "Under the collective bargaining agreement, *the only seniority that Mr. Cook has is as a locomotive engineer, and so he is maintained on the seniority roster of engineers for his particular working district*."  (NEOC Transcript at 149:15-150:5; 181:8-184:9; 197:3-21; 204:15-206:5 (emphasis added).)

29.     Notwithstanding this designation, Cook could have applied for any other job at UP, the duties of which were within the restrictions imposed by his treating physician, but he failed to do so.  (*Id.*)

30.     On February 21, 2007, ALJ Scudder issued his Recommendations. (Filing 23-3, at CM/ECF pp. 53-57.)[3]

31.     The ALJ concluded that the "act of discrimination alleged by [Cook] to have been perpetrated was [Union Pacific's] specific declaration made for the first time on January 3rd, 2002 in a letter from F.A. Tamisiea Director- Labor Relations for [Union Pacific] explaining that [Cook] was estopped from claming he was available to return to work in his prior capacity.  This position was restated in a second letter of June 4, 2002."  (Filing 23-3, at CM/ECF p. 56 (citations omitted).)

32.     The ALJ further concluded that after "correspondence of June 4, 2002, [Union Pacific] has taken no new action in regard to any of the these Requests." (*Id.*)

33.     The ALJ found that "[t]he Statute of Limitations began running in this case on January 4th, 2002," and Cook filed his charge on January 26, 2005.  (*Id.*)

_____

[3]UP argues that the ALJ's findings of fact are entitled to preclusive effect.  As resolution of that issue is not necessary to disposition of the parties' motions for summary judgment, I do not address it.  However, I have described the NEOC proceedings in the interest of providing a full, clear statement of facts.

34.    The ALJ also made the following findings regarding Cook's evidence of a "disability":

> Complainant failed to establish a record of disability. To have prevailed on his claim, Complainant was required to prove that:  (1) he suffers from a substantial limitation in one or more major activities of life; (2) there is a record of such an impairment and (3) he is regarded as disabled even though he does not have a substantial impairment. The determination of whether an individual is disabled must be made at the time of the adverse employment action. Thus an individual must be presently disabled, not potentially or hypothetically, and a person with an impairment that might, could or would be substantially limiting if certain circumstances existed does not have a disability. Disability Law Deskbook: par.2-3.[] It is clear that Complainants [sic] doctor did not believe that his patient had a substantially limiting impairment. Neither did Complainant. Nothing in Complainants [sic] past medical record substantiated the existence of an impairment that could possibly be called "substantial." Complainant's testimony in his Federal Employees Liability Act proceeding was uncertain as to any disability.  No decision was ever made by Respondent.

(*Id.* at CM/ECF p. 57.)

35.    The ALJ also made the following findings regarding judicial estoppel:

> In applying the doctrine of judicial estoppel, the court must find that the following five requirements are present: (1) the two positions must be taken by the same party; (2) the positions must be taken in judicial proceedings; (3) the positions must be given under oath; (4) the party taking the positions must have been successful in maintaining the first position and receive benefit; and (5) the two positions must be totally inconsistent. . . .

> All five of these points exist in this case and, even were Complainant not barred from having a Hearing by the Statute of

Limitations, the concept of Judicial Estoppel would be a bar and his case ought to be dismissed for that reason.

(*Id.*)

36.     On March 16, 2007, the NEOC ordered that the Recommendations of the ALJ be entered as the official Final Order of the NEOC.  (Filing 23-4, at CM/ECF p. 31.)

### *Judicial Proceedings*

37. Cook then appealed the NEOC's Final Order to the District Court of Lancaster County, Nebraska.  The court dismissed Cook's appeal for lack of subject matter jurisdiction because Cook failed to serve a request for preparation of the official record on the NEOC within 30 days of filing the petition for review, as required by Nebraska statute.  (Filing 23-4, at 35.)

38.     Cook then requested and received a Right to Sue letter from the EEOC and filed the instant action on September 28, 2007.  (Filing 1.)

## II.  ANALYSIS

### A.  Summary Judgment Standard

Summary judgment should be granted only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  *See also Egan v. Wells Fargo Alarm Servs.*, 23 F.3d 1444, 1446 (8th Cir.1994).  It is not the court's function to weigh evidence in the summary judgment record to determine the truth of any factual issue.  *Bell v. Conopco, Inc.*,

12

186 F.3d 1099, 1101 (8th Cir. 1999).   In passing upon a motion for summary judgment, the district court must view the facts in the light most favorable to the party opposing the motion.  *Dancy v. Hyster Co.*, 127 F.3d 649, 652 (8th Cir. 1997).

In order to withstand a motion for summary judgment, the nonmoving party must substantiate their allegations with "'sufficient probative evidence [that] would permit a finding in [their] favor on more than mere speculation, conjecture, or fantasy.'" *Moody v. St. Charles County*, 23 F.3d 1410, 1412 (8th Cir. 1994) (quoting *Gregory v. City of Rogers*, 974 F.2d 1006, 1010 (8th Cir. 1992)).  "A mere scintilla of evidence is insufficient to avoid summary judgment."  *Id.*  Essentially the test is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

The Eighth Circuit Court of Appeals has stated that "summary judgment should be used sparingly in the context of employment discrimination . . . where direct evidence of intent is often difficult or impossible to obtain."  *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1117 (8th Cir. 2006) (citing cases).  However, the Court of Appeals has also stated that "no separate summary judgment standard exists for discrimination or retaliation cases and that such cases are not immune from summary judgment."  *Id*. at 1118 (citing cases).

## B.  ADA Claim

Plaintiff Cook claims that UP intentionally discriminated against him when it refused to reinstate him based on his record of disability or perceived disability in violation of the ADA.  UP argues that Plaintiff's claim is barred by the statute of limitations and judicial estoppel, and that, in any event, Plaintiff's claim must be denied on the merits.

### *1.  Statute of Limitations*

For purposes of the parties' motions for summary judgment, I shall assume that the plaintiff's ADA claim was timely filed.

### *2.  Judicial Estoppel*

The doctrine of judicial estoppel prevents a party from taking a position during litigation which is contrary to one taken in a prior judicial or quasi-judicial proceeding. The underlying purpose is to protect the judicial process**.** *Leonard v. Southwestern Bell Corp. Disability Income Plan,* 341 F.3d 696, 702 (8th Cir. 2003)**.** Judicial estoppel is only available as a means to bar inconsistent statements if the prior statements were adopted by a court, made in a judicial proceeding, or made in the same or related litigation.  *Id.*

*Amtrust Inc. v. Larson*, 388 F.3d 594, 600-01 (8th Cir. 2004).

Factors that may be considered in deciding whether to apply the doctrine of judicial estoppel include: (1) whether a party's later position is clearly inconsistent with its earlier position; (2) whether the party has "succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled," thereby threatening judicial integrity; and (3) whether the party attempting to assert the inconsistent position would gain an unfair advantage or "impose an unfair detriment on the opposing party if not estopped."  *New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001) (internal quotations and citations omitted).  These factors are not exhaustive nor inflexible, and "[a]dditional considerations may inform the doctrine's application in specific factual contexts." *Id.* at 751.  For instance, "even when the prior statements were not made under oath, the doctrine may be invoked to prevent a party from playing fast and loose with the

14

courts." *Monterey Devel. Corp. v. Lawyer's Title Ins. Corp.*, 4 F.3d 605, 609 (8th Cir. 1993) (internal quotations and citations omitted).

In this case, the integrity of the judicial process would be compromised by allowing Cook to argue in this court that UP violated the ADA when it refused to reinstate him to his locomotive engineer position when he and his lawyer took the position in Cook's 1999 FELA trial that Cook may be unable to return to work as a locomotive engineer. The jury awarded Cook $610,000 after Cook's attorney told the jury that it should award damages "in [the] range of 473[,000] to . . . 694 [,000][4], depending on whether you think he's going to be able to go back to work as an engineer" and that Cook's damages "[have] got to cover this past 3 years, 9 months, and the future, 36, 37 years." Cook's FELA complaint alleged "permanent, . . . disabling" injuries that would be "incapacitating" for "an indefinite time in the future," and Cook's physician testified that "[Cook] told me [that] he's incapable of . . . riding trains for hours at a time day after day." (Filing 23-3, Request for Admission No. 8, at CM/ECF p. 44; Filing 23-3, Request for Admission No. 9, at CM/ECF p. 45; Filing 23-3, Request for Admission No. 10, at CM/ECF pp. 45-46; Filing 23-3, Request for Admission No. 13, at CM/ECF p. 47.)

---

[4]The FELA jury awarded Cook $610,000, well above the $473,000 scenario given by Cook's attorney in which Cook could return to work as an engineer after two years. The jury could not have returned a verdict of $610,000 without awarding Cook damages for his future inability to return to work as a locomotive engineer. The FELA court entered judgment for Cook in the amount of the jury's verdict, and there is evidence that Cook was actually paid the $610,000. (Filing 19-5, at CM/ECF pp. 16-19 (Judgment & Satisfaction of Judgment).) While Cook argues that "no special verdict forms [were] presented to the jury to show how they arrived at the numbers that they did" (filing 26, at 14), "the critical issue is what the employee contended in the underlying proceeding, rather than what the jury found. . . . the fact that we cannot say that the $120,000 finding for damages represented a conclusion by the jury that [the plaintiff] was permanently disabled makes no difference." *Lewandowski v. National R.R. Passenger Corp. (Amtrak)*, 882 F.2d 815, 819 (3rd Cir. 1989).

Cook dramatically emphasized his position that he was unable to return to work as a locomotive engineer when he testified:

> And the main reason the—that—and what really concerns me is—the safety, as far as my fellow employees, people on other trains, as far as opposing trains, and the public, because pain pretty much controls my life.  If I'm out there and thinking about pain and not thinking about my job—and there's literally hundreds of things that you have to do, that you have to be aware of; and if I'm out there, and all I'm thinking about is pain, and I'm spacing off, and I run over somebody at a crossing, hit a school busload of kids, or if I run the red signal and I run into another train, cost millions of dollars of damage and—kill myself and other people, I just don't really want that on my head.

(Filing 23-3, Request for Admission No. 12, at CM/ECF p. 46.)

From the filing of his FELA complaint to his lawyer's final argument to the jury, Cook took the position that his injuries were permanent and, as a result, he could not return to work as a locomotive engineer for UP.  He cannot now claim that UP violated the ADA by refusing to reinstate him to that very same job.  In short, Cook's attempt to play "fast and loose" with the courts is prohibited by judicial estoppel.  *See Scarano v. Central R. Co.*, 203 F.2d 510, 513 (3rd Cir. 1953) ("[A] party to litigation will not be permitted to assume inconsistent or mutually contradictory positions with respect to the same matter in the same or a successive series of suits. . . .  And this is more than affront to judicial dignity.  For intentional self-contradiction is being used as a means of obtaining unfair advantage in a forum provided for suitors seeking justice.") (internal quotations & citations omitted)[5]; *Monterey Devel. Corp. v.*

---

[5]The *Scarano* court described the facts before it:

> The particular facts and circumstances we rely on here are these.  Plaintiff asserted in a judicial proceeding, and introduced evidence

*Lawyer's Title Ins. Corp.*, 4 F.3d 605 (8th Cir. 1993) (describing doctrine of judicial estoppel and citing *Scarano*); *Lewandowski v. National R.R. Passenger Corp. (Amtrak)*, 882 F.2d 815 (3rd Cir. 1989) (railroad employee was judicially estopped from suing railroad for denying reinstatement when employee previously sued railroad under FELA and recovered jury verdict of $120,000 after employee's attorney requested future lost wages and argued that employee was "not going to be able to work at the railroad" due to injury).

### 3.  Merits of ADA Claim

Even if Cook's ADA claim were not judicially estopped, it would still fail on the merits.  The Americans with Disabilities Act ("ADA") provides:  "No covered entity shall discriminate against a qualified individual with a disability because of the

---

tending to prove, that he was not able and would not be able to work. He claimed damages for this lost ability to earn wages. As a result of that claim, and by the aid of that judicial proceeding, plaintiff obtained from defendant a sum of money which by its size considering plaintiff's age and earning record, indicates that it was intended to recompensate him for his loss of ability to earn wages for at least a substantial future period. Now he asks the same court to hear him on a claim that less than a month after this compensatory recovery he was physically rehabilitated and entitled to be restored to duty and pay status by the defendant on peril of a new compensatory recovery for loss of wages from the date of requested reemployment. Not only does plaintiff found successive claims on inconsistent facts, but he now seeks a duplicating recovery, if we are to respect the legal theory of the earlier claim in settlement of which he received a substantial sum. In these circumstances we think it was proper for the District Court to refuse to allow plaintiff to litigate a claim in contradiction of his earlier position.

*Scarano*, 203 F.2d at 513-14.

disability of such individual in regard to . . . discharge of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "Disability" with respect to an individual means "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). "Major life activities" are activities "such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i).

Here, Cook claims that because he was "unable to work as a railroad engineer for 5 years" due to back injuries, UP discriminated against him based on "a record of a disability which substantially limited his major life activity of working" when it refused to reinstate him as a locomotive engineer. (Filing 26, at 16.) Cook also claims that UP "regarded him" as having a disability.

Having a "record" of impairment means that one "has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 29 C.F.R. § 1630.2(k). "For ADA purposes, the definition of 'regarded as disabled' assumes that the individual is not actually disabled." *Christensen v. Titan Distrib., Inc.*, 481 F.3d 1085, 1092 n.2 (8th Cir. 2007) (citing *Wenzel v. Missouri-American Water Co.*, 404 F.3d 1038, 1041 (8th Cir. 2005)). "An employer regards an employee as disabled if it 'mistakenly believes that the employee has an impairment (which would substantially limit one or more major life activity), or [it] mistakenly believes that an *actual* impairment substantially limits one or more major life activity.'" *Id.* at 1093 (quoting *Chalfant v. Titan Distribution, Inc.*, 475 F.3d 982, 988-89 (8th Cir. 2007) (in turn quoting *Wenzel*, 404 F.3d at 1041)).

An employee is substantially limited from working when he is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes." *Chalfant*, 475 F.3d at 989 (quotation omitted). If an employer mistakenly believes that an

18

employee is unable to perform a class of jobs or a broad range of jobs, then the employer regards the employee as disabled. *See id.* However, if an employer only mistakenly believes the employee is unable to perform a single job, then the employer does not regard the employee as disabled. *Id.*

*Christensen v. Titan Distrib., Inc.*, 481 F.3d at 1093. *See also Miller v. City of Springfield*, 146 F.3d 612, 615 (8th Cir. 1998) ("working" within the context of one's "major life activity of working" for purposes of the ADA "does not mean working at a particular job of the person's choice") (citing cases). "Inability to perform one particular job does not constitute a substantial limitation on working. Instead, a plaintiff must show that because of his impairment he has suffered a significant reduction in meaningful employment opportunities." *Philip v. Ford Motor Co.*, 328 F.3d 1020, 1024 (8th Cir. 2003) (internal citation omitted).

Plaintiff has presented no evidence that he has suffered a "significant reduction in meaningful employment opportunities" or that UP regarded him as such. To the contrary, the evidence repeatedly establishes that Cook requested to be reinstated to one particular job with UP—locomotive engineer—and UP specifically denied him the opportunity to obtain that particular job. (Undisputed Material Facts in this Memorandum and Order ¶¶ 14-20 (Cook requesting to be reinstated as locomotive engineer, UP denying Cook's requests to be reinstated "as an Engineer," UP repeatedly referring to reinstatement in terms of Cook's "prior capacity").) Further, Plaintiff has failed to submit evidence that Cook applied for, and was denied, other jobs at UP. This lack of evidence—along with the fact that Cook's requests for reinstatement and UP's denials of such requests involved one particular job—would prevent a reasonable juror from concluding that UP regarded Cook as unable to perform a class of jobs or a broad range of jobs at UP—that is, that UP regarded Cook as substantially limited in the major life activity of working.

19

Even assuming Cook had made out a prima facie case of ADA discrimination, UP has submitted evidence establishing that it had a legitimate, nondiscriminatory reason for not giving Cook a medical examination to return to work and for not reinstating him in a locomotive engineer position—public safety. *Kozisek v. County of Seward*, 539 F.3d 930, 935 (8th Cir. 2008) (once plaintiff makes out prima facie case, burden of production shifts to employer to articulate a legitimate, nondiscriminatory reason for its actions).

Specifically, Cook unequivocally testified at his FELA trial that the pain from his back injury could result in catastrophic injuries, his death, and the death of school children if he operated a train in the position of a locomotive engineer. UP explicitly cited this public-safety concern in its June 4, 2002, letter to Cook which denied Cook's request for reinstatement. (Filing 25-4 ("Engineer Cook claimed the pain from his injury controls his life and if he could work as an Engineer, the pain was so extreme that he probably could not operate a train and perform engineer duties in a safe manner. Thus, Mr. Cook claims his pain along with his permanent restrictions could result in possible catastrophic injuries to fellow employees, the general public and millions of dollars in damage to property.")

Surely the plaintiff's own admission that his pain would cause him to inflict catastrophic injury upon himself and the general public if he were to continue his work as a locomotive engineer constitutes a legitimate, nondiscriminatory reason for refusing to reinstate Cook to that same position. This is especially so when Cook's attorney argued to the jury in Cook's FELA case that his injury was permanent and Cook's injury would prevent him from performing the locomotive engineer job for the rest of Cook's working life. (Filing 23-3, Request for Admission No. 9, at CM/ECF p. 45 ("[w]hat he's awarded, if anything, by you has got to cover this past 3 years, 9 months, and the future, 36, 37 years"); Filing 23-3, Request for Admission No. 8, at CM/ECF p. 44 (complaint in FELA case alleged that "Plaintiff's injuries . . . have been permanent, painful, disabling and incapacitating, and for an indefinite

20

time in the future will be painful, disabling, and incapacitating . . . .  Plaintiff was deprived of his earning power, to his damage in an amount as yet unascertainable.").)

In response to UP's legitimate, nondiscriminatory reason for refusing to reinstate Cook to the locomotive engineer position, Cook has failed to demonstrate that UP's proffered reason for its actions was false and that unlawful discrimination was the real reason for refusing to reinstate Cook to his prior position.  To the contrary, UP relied upon Cook's own sworn testimony from the FELA trial that he was in so much pain that he could cause serious injury or death to himself and the public, as well as millions of dollars in property damage, if he were to continue to perform the locomotive engineer job.  *Kozisek v. County of Seward*, 539 F.3d at 935 (after employer asserts legitimate, nondiscriminatory reason for its actions, burden of production shifts back to plaintiff to show that employer's reason is really pretext for unlawful discrimination); *McNary v. Schreiber Foods, Inc.*, 535 F.3d 765 (8th Cir. 2008) (to demonstrate pretext, plaintiff must submit sufficient evidence demonstrating both that employer's articulated reason for adverse employment action was false and that discrimination was the real reason; plaintiff must do more than create factual dispute as to pretext; rather, plaintiff must offer sufficient evidence for reasonable trier of fact to infer discrimination).

Therefore, Cook's ADA claim fails and summary judgment must be granted in favor of the defendant.

## C.  State-Law Claim

Cook also claims that UP violated Nebraska law when it retaliated against him by refusing to reinstate him because of his prior FELA claims.  (Filing 1, Complaint; Filing 33, Order on Final Pretrial Conference.)

21

When a district court dismisses federal claims over which it has original jurisdiction, the balance of interests usually "will point toward declining to exercise jurisdiction over the remaining state law claims." *In re Canadian Import Antitrust Litigation*, 470 F.3d 785, 792 (8th Cir. 2006) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)). *See also Gibson v. Weber*, 433 F.3d 642, 647 (8th Cir. 2006) ("Congress unambiguously gave district courts discretion in 28 U.S.C. § 1367(c) to dismiss supplemental state law claims when all federal claims have been dismissed . . . ."). Indeed, the Court of Appeals has "stress[ed] the need to exercise judicial restraint and avoid state law issues wherever possible." *Gregoire v. Class*, 236 F.3d 413, 420 (8th Cir. 2000) (quoting *Condor Corp. v. City of St. Paul*, 912 F.2d 215, 220 (8th Cir.1990)). "[W]hen state and federal claims are joined and all federal claims are dismissed on a motion for summary judgment, the state claims are ordinarily dismissed without prejudice to avoid needless decisions of state law . . . ." *Id.* at 420-21 (quoting *ACLU v. City of Florissant*, 186 F.3d 1095, 1098-99 (8th Cir. 1999)).

Therefore, I shall dismiss Cooks's state-law claim without prejudice. *See Labickas v. Arkansas State Univ.*, 78 F.3d 333, 334-35 (8th Cir. 1996) (per curiam) (while district court had discretion to dismiss state-law claims, such claims should have been dismissed without prejudice).

IT IS ORDERED:

1.    Defendant's motion for summary judgment (filing 21) is granted as follows: Plaintiff's claim under the Americans with Disabilities Act is dismissed with prejudice, and Plaintiff's state-law retaliation claim is dismissed without prejudice;

2.    Plaintiff's motion for summary judgment (filing 18) is denied;

22

3.    Judgment shall be entered by separate document in favor of Defendant and against Plaintiff, providing that Plaintiff shall take nothing.

October 7, 2008.

BY THE COURT:
s/ *Richard G. Kopf*
United States District Judge